DIANA GRIBBON MOTZ, Circuit Judge, dissenting:
The Eighth Amendment outlaws the unnecessary infliction of pain, even on convicted felons. Quentin Jackson presented ample evidence from which the jury could conclude, as it did, that correctional officers maliciously and sadistically used excessive force to inflict unnecessary and wanton pain on him, in clear violation of the Eighth Amendment. The jury’s award to Jackson of one dollar in actual damages and $9,500 in punitive damages is a measured and entirely appropriate response to the evidence presented at trial. Accordingly, I would affirm the jury verdict and must respectfully dissent from the majority’s refusal to do so.
I.
The facts giving rise to this lawsuit occurred on January 11, 1994, during a routine “shakedown,” (body and cell search) at the Maryland Correctional Adjustment Center (MCAC). At trial, the parties offered conflicting testimony as to what transpired during this search. In light of the jury verdict in favor of Jackson, we are required to view the facts in the light most favorable to him. See Fed.R.Civ.P. 50(a). Nevertheless, in order to set forth all of the legal issues involved, I also include the officers’ version of the facts.
Jackson testified that, while he was unclothed, Officer Morgan ordered him to turn in circles repeatedly, not just once or twice as is normal in a shakedown. Jackson objected to this perceived harassment, calling Officer Morgan a homosexual. Jackson stated that, despite this harass *104 ment, he permitted the officers to continue the search, and then, when they were finished, he asked to see the officers’ superior so that he could voice his concerns and obtain the appropriate form to make a written complaint to the Warden. A few minutes later, according to Jackson’s testimony, instead of the officers’ superior, a Response Team arrived wearing riot gear and gas masks to extract Jackson from his cell.
The officers testified, to the contrary, that Jackson refused to leave his cell during the shakedown, thereby preventing them from searching it. Although the officers acknowledged that they ultimately persuaded Jackson to vacate his cell so that it could be searched, they maintained that Jackson created a disturbance in the cell block by yelling obscenities and banging on the walls. According to the officers, when they informed Jackson that he would be placed in an isolation cell for creating a disturbance, he refused to comply with the ordinary removal procedures. For this reason, they assembled a six-person Response Team to transport Jackson to the isolation cell known as the Pink Room to “cool down.”
Jackson maintains that he created no disturbance necessitating removal from his cell to “cool down.” When the Response Team arrived at his cell, Jackson testified that he was sitting quietly on his bunk reading. Jackson’s account, rather than the officers’ was apparently credited at a subsequent prison disciplinary hearing, in which Jackson was found not guilty of creating a cellblock disturbance.
Many of the remaining relevant facts are clearly documented in the Response Team’s videotape, which begins with the Team’s arrival at Jackson’s cell. The tape starts at 1:54 p.m. with an introduction and identification of the Response Team. The tape shows only the outside of Jackson’s cell, from which point Jackson cannot be seen, but no disturbance can be heard.
The videotape reveals that, at 1:56 p.m., Officer Locklear orders Jackson to pass his clothes out and to place his hands in the feed slot to be cuffed. Jackson responds by stating that he had just been searched, and asks the purpose of the officers’ request. Locklear then sprays two bursts of pepper spray into Jackson’s cell ,[1] Jackson testified, without contradiction, that the first burst of pepper spray struck him in the groin, causing a painful burning sensation, and the second burst struck him in the face, causing him to cry out in pain. Jackson stated that he felt like his body was burning and he began to choke and gag from inhalation of the pepper spray. His eyes swelled shut and he was unable to breathe. Due to the pain he was experiencing, Jackson maintains that he became confused and disoriented, and was unable to understand the orders the Response Team directed to him.
At 1:58 p.m., two minutes after the first bursts of pepper spray, Jackson has still not complied with the Response Team’s orders; Locklear sprays four additional bursts of pepper spray into Jackson’s cell. At 1:59 p.m., Jackson passes his jumpsuit through the feed slot to the officers. *105 Locklear then orders Jackson to send out the rest of his clothes as well. At 2:00 p.m., Locklear sprays an additional burst of pepper spray, this one lasting a full six seconds. The videotape reveals that this burst of pepper spray causes Jackson to cough and gag. At 2:01 p.m., Jackson passes his underwear and shoes through the feed slot. Nevertheless, at 2:02 p.m., the administration of five additional bursts of pepper spray can be heard. At trial, Officer Maddox acknowledged that, at that point, he had gone around to the back of Jackson’s cell and sprayed into Jackson’s cell through the window, which was covered by a mesh screen.
At 2:03 p.m., Jackson places his hands in the feed slot to be handcuffed, and exits his cell wearing a jumpsuit. The tape reveals that Jackson is in obvious pain; he gasps for air and rubs his teary eyes. At 2:04 p.m., the Response Team leads Jackson to the infirmary. Jackson has difficulty walking and, at one point, falls down. At 2:05 p.m., while walking to the infirmary, Jackson begins babbling incoherently. (Jackson testified that at this time he was “speaking in tongues” and praying to God.) At 2:06 p.m., shortly after going through a doorway, Jackson testified that Officer Fenton struck him in the back of the head. Although Officer Fenton denied striking Jackson, the blow can be seen on the videotape.
At 2:07 p.m., the officers take Jackson to the nurse. The officers permit him to rinse his head in a sink for several minutes and to rub his genitals with a wet paper towel. In addition, the nurse rubs Jackson’s face with a paper towel. This is the only medical treatment that the officers provided Jackson before confining him to the Pink Room isolation cell.
From 2:12 p.m. to 2:19 p.m., the Response Team prepares Jackson for placement in the Pink Room. During this period the Team removes Jackson’s shackles and orders Jackson to remove his jump-suit and underwear. After several minutes, during which time Jackson is naked, the officers provide him with clean underpants, but nothing else. The officers then re-shackle Jackson and place him in the isolation cell, clothed only in his underwear. The videotape record of the entire preparation period shows Jackson remaining calm throughout. Department of Corrections (DOC) regulations state that prison officials can place in-cell shackles on an inmate only when he presents a serious threat of violence.
Although it is no longer in use, at the time of this incident, the Pink Room was a bare cell approximately ten feet by ten feet with metal walls, a concrete floor and no furniture. It lacked a toilet, and instead had a hole in the floor, covered by a grate, which, during Jackson’s confinement, was encrusted with feces and blood.
Jackson testified that the shackles placed on him throughout his confinement in the Pink Room were so tight that he could not move his hands, and so he could not even remove his underwear to urinate. Although it was very cold in the Pink Room and Jackson was clad only in underwear, the officers provided him with no bedding or clothes. In addition to the cold and the painful shackles, Jackson testified that he was in continual pain due to the effects of the pepper spray during the entire period of his confinement in the Pink Room.
According to the logs of Jackson’s confinement, although he was awake and alert, the officers did not provide him with any food for sixteen hours. When he was finally provided with food, during the seventeenth hour of his confinement, Jackson testified that the shackles prevented him from eating. The logs record that Jackson remained calm for the first seventeen *106 hours he was imprisoned in the Pink Room. Nevertheless, his confinement there continued for nearly forty-five hours.
Captain Jeffrey Wells, a DOC employee, testified at trial as an expert witness for the officers. Wells stated his opinion that this case presented a need to use force and to remove Jackson from his cell. He also opined that the use of twelve bursts of pepper spray was an appropriate amount of force. He agreed that in-cell restraints should never be used as a form of punishment but only as a “management tool” to control an inmate while the inmate was in an isolation cell.
Vincent Nathan, a lawyer specializing in prison law, testified as an expert for Jackson. Nathan noted that Jackson was not creating a disturbance or threatening anyone at the time the Response Team forcibly extracted him from his cell, and so there was no need to relocate him. Nathan also noted that the correctional officers made no attempt to use non-forceful means to resolve the situation. Nathan further testified that the prison officials did not sufficiently decontaminate Jackson from the pepper spray. All of the exposed areas of Jackson’s body should have been flushed with water and washed with soap after the incident. (Although the prison’s protocol also required that all exposed areas of an inmate’s body be flushed with water, the officers only permitted Jackson to rinse his head and genitals with water for a short time.) Given these facts, Nathan opined that the Pink Room confinement of Jackson constituted a grossly excessive use of force.
II.
In March 1995, Jackson initiated this action, alleging that the MCAC officers’ use of excessive force on January 11-13, 1994, violated his Eighth Amendment right to be free from cruel and unusual punishment. With the parties’ consent, Magistrate Judge Paul W. Grimm presided over a jury trial on Jackson’s claims. The jury found for the correctional officers on Jackson’s claim that use of the pepper spray in itself constituted excessive force, but found for Jackson on his claim that the officers used excessive force in confining him in three-point restraints in the manner they did for almost two days.[2] The jury awarded Jackson one dollar in compensatory damages and $9,500 in punitive damages.
The jurors also requested that the following statement be read into the record:
We find that the conditions existing at the Maryland Correctional Adjustment Center, in particular, the isolation cell known as the “pink room” violate the eighth amendment rights of prison occupants. Specifically we regard the conditions inflicted upon the prisoners of “a sort repugnant to the conscience of mankind.” ... We urge the cessation of the use of the “pink room” while its conditions violate the eighth amendment.
Judge Grimm denied the officers’ post-trial motion for judgment as a matter of law, and the officers appealed to this court.
As the majority recognizes, although we review de novo a district court’s legal determinations, a jury’s factual finding must be affirmed unless there is “no legally sufficient evidentiary basis for a reasonable jury” to so find. Fed.R.Civ.P. 50(b). Indeed, reviewing courts “owe great defer *107 ence to the jury’s view of the evidence.” Newman v. Holmes, 122 F.3d 650, 653 (8th Cir.1997) (affirming jury verdict for prisoner where question of whether guard was deliberately indifferent was “very close”). Moreover, we, as an appellate court, cannot re-weigh the evidence or judge credibility, but rather must view the evidence in the light most favorable to Jackson as the prevailing party.
III.
The Eighth Amendment prohibits the infliction of “cruel and unusual punishments.” U.S. Const, amend. VIII. Undeniably, the “unnecessary and wanton infliction of pain,” constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); Ingraham v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).
To determine whether a prison official has violated the Eighth Amendment, courts must analyze both subjective and objective components. See Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Specifically, this analysis requires “inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component).” Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir.1996). “What is necessary to establish an unnecessary and wanton infliction of pain” with regard to each component “varies according to the nature of the alleged constitutional violation.” Hudson, 503 U.S. at 5, 112 S.Ct. 995 (internal quotation marks omitted).
In an excessive force case, a claimant must meet a heavy burden to satisfy the subjective component of the claim; specifically, he must prove that correctional officers applied force “maliciously and sadistically for the very purpose of causing harm.” Whitley, 475 U.S. at 320-21, 106 S.Ct. 1078. The objective component of an excessive force claim is not nearly as demanding, however, because “[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident.” Hudson, 503 U.S. at 9, 112 S.Ct. 995. With these principles in mind, I turn to the facts of this case.
IV.
The majority rests its decision to reverse the jury verdict solely on the ground that Jackson faded to offer sufficient evidence to satisfy the objective component of his excessive force claim. Accordingly, I begin with an analysis of that component.
To establish the objective component of an excessive force claim, generally a plaintiff must simply prove that he suffered more than de minimis injury. Id. at 9-10, 112 S.Ct. 995. However, if “a particular application of force ... eause[s] relatively little, or perhaps no, enduring injury, but nonetheless ... result[s] in an impermissible infliction of pain,” the pain itself “will be such that it can properly be said to constitute more than de minimis injury.” Norman v. Taylor, 25 F.3d 1259, 1263 n. 4 (4th Cir.1994). Moreover, when the amount of force used is “of a sort repugnant to the conscience of mankind,” the plaintiff need not show even de minimis injury to satisfy the objective component. Id. In such a case, even if the plaintiff suffered no lasting injury, he can prevail on the objective component of an excessive force claim. Jackson offered the following evidence in support of the objective component of his claim:
*108 — The officers sprayed his cell with pepper spray twelve times.
— Pepper spray causes pain, burning, inflammation of the mucous membranes in the eyes, nose and throat, skin inflammation, induces coughing or gagging and causes the eyes to close involuntarily. The spray also produces psychological effects, such as fear, disorientation, anxiety and panic.
— Jackson did not receive any medical treatment after being exposed to the pepper spray. Satisfactory decontamination from the effects of pepper spray requires one to flush all affected areas with water and wash them with soap. The officers’ only attempt at decontamination was limited to giving Jackson a few minutes to rinse his face and groin area with water.
— After removing him from his cell, the officers locked Jackson in an isolation cell, known as the Pink Room, for forty-four hours.
— The Pink Room was a bare cell approximately ten feet by ten feet with metal walls, a concrete floor and no furniture. It lacked a toilet, and instead had a grate in the floor encrusted with feces and blood.
— Although it was January, Jackson was not provided with any bedding, clothing—save a single pair of underpants—or other means of staying warm.
— The officers withheld food from Jackson for sixteen hours.
— During his confinement, Jackson was forced to wear excessively tight three-point restraints which caused him pain when he moved and prevented him from eating and removing his clothes to urinate.
After receipt of this evidence, Judge Grimm instructed the jury that it could award nominal damages, such as one dollar, but only if it found “that the plaintiff is entitled to a verdict in accordance with these instructions, but [did] not find that the plaintiff has suffered substantial actual damages.” See ante at 102 (quoting jury instructions). The officers do not offer any objection to the jury instructions, nor could they since the instructions are clearly proper. Thus, a properly instructed jury awarded Jackson one dollar in nominal damages and $9,500 in punitive damages. Even the majority acknowledges that this award reflects the jury’s clear finding that Jackson had suffered more than de minimis injury. See ante at 102.
In rejecting this finding, the majority relies on the distinctions between this case and Williams v. Benjamin, 77 F.3d 756 (4th Cir.1996). See ante at 102-103. The majority contends that Jackson did not suffer more than de minimis injury in the form of an impermissible infliction of pain because (i) pepper spray is a milder irritant than the tear gas used in Williams, (ii) exposure to pepper spray does not necessitate medical treatment as does tear gas, nor does it have any permanent effect and (iii) the four-point restraints used in Williams were more restrictive than the three-point restraints used here. See ante at 102-103.
Cases seldom present identical facts, and the facts in this case obviously are not identical to those in Williams; however, I believe that in significant respects the facts here evidence a more, not less, egregious infliction of unnecessary pain. Although pepper spray may be a milder irritant than tear gas, Vincent Nathan, Jackson’s expert, testified that exposure to pepper spray causes painful burning in the eyes, nose, and throat, swelling, skin irritation and coughing or gagging, as well as psychological trauma, including fear, disorientation, anxiety and panic. Jackson’s testimony confirmed that he experienced all of these effects, and that he was *109 not properly decontaminated after his exposure to pepper spray—a fact which MCAC’s own regulations confirm. Moreover, while Jackson was bound in three-point restraints, as opposed to the four-point type used on Williams, Jackson was confined in the painfully tight restraints and prevented from using his hands to feed himself or assist in urination for forty-four hours—almost six times as long as Williams’s confinement.[3]
Even if this were not a stronger ease than Williams, the evidence summarized above undoubtedly constitutes ample proof of an imposition of pain sufficient to support the jury’s verdict. Despite the majority’s efforts to recast the evidence, a reasonable jury could certainly have found that the evidence offered of forty-four hours of pain and inhumane treatment demonstrated “an impermissible infliction of pain” resulting in greater than de minimis injury. Norman, 25 F.3d at 1263 n. 4.
Moreover, even if I agreed with the majority’s conclusion that Jackson’s prolonged confinement in the Pink Room did not cause him to suffer an impermissible amount of pain constituting more than de minimis injury, we would nonetheless be obligated to sustain the jury’s verdict because the record reveals abundant evidence that the force used on Jackson was of the sort “repugnant to the conscience of mankind.” Id. Where the amount of force used rises to this level, a claimant need not show even de minimis injury to satisfy the objective element of an excessive force claim. See id.
In the instant case, the jury not only found for Jackson on his excessive force claim arising from his confinement in the Pink Room, it also took the “extraordinary measure” of requesting that a statement be read into the record expressing its disapproval of the guards’ treatment of Jackson. In this statement, the jury stated unequivocally that it “regarded] the conditions inflicted upon the prisoners [in the Pink Room] of a sort repugnant to the conscience of mankind.” Although the majority dismisses the jurors’ statement as “gratuitous,” ante at 102, surely these words, in conjunction with the jurors’ modest damages award, signal that they carefully assessed the evidence presented and concluded, as they expressly stated, that the guards acted in a manner “repugnant to the conscience of mankind.” I fear that, in its dismissal of the jury’s words, the majority forgets that it is juries, and not courts, who are charged with expressing the conscience of the community. See Jones v. United States, 527 U.S. 373, 382, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (“[I]n a capital sentencing proceeding, the Government has ‘a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.’ ”) (quoting Lowenfield v. Phelps, 484 U.S. 231, 238, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)); see also BMW of North America, Inc. v. Gore, 517 U.S. 559, 600, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) *110 (Scalia, J. dissenting) (“[P]unitive damages represent the assessment by the jury, as the voice of the community, of the measure of punishment the defendant deserved.”).
In sum, Jackson offered more than sufficient evidence to satisfy the objective component of his excessive force claim.
V.
The evidence is equally clear that Jackson satisfied the subjective component, i.e., he offered abundant evidence that the correctional officers applied force “maliciously and sadistically for the very purpose of causing harm.” Whitley, 473 U.S. at 320-21, 105 S.Ct. 3180.
In determining whether prison officials have acted “maliciously and sadistically” a court should balance: (i) the need for the application of force, (ii) the relationship between that need and the amount of force used, (iii) the threat reasonably perceived by the responsible officials, and (iv) any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7, 112 S.Ct. 995 (citing Whitley, 475 U.S. at 321-22, 106 S.Ct. 1078). The absence of serious injury is also a relevant, but not dispositive, factor to be considered in the subjective analysis. Id.
With respect to the first Whitley factor, the need to use force, the jury unquestionably could have concluded that the officers did not need to confine Jackson to the Pink Room in unduly tight three-point restraints, without clothing, bedding, a toilet or even the opportunity to properly clean off the pepper spray, for nearly two days. No doubt, in certain situations, pepper spray, isolation confinement, and three-point restraints can serve valid penological purposes. But the officers have not even offered a justification for the prolonged use of all three of these tools in this case, or for the manner in which they were used.
The record evidence reveals that when the Response Team arrived at Jackson’s cell, he was calm; any disturbance caused by Jackson’s earlier disruptive behavior had clearly ceased. Even if Jackson initially disobeyed orders to submit to a search (and we are bound to credit Jackson’s testimony that he did not), it is undisputed that Jackson complied with these orders as quickly as he could after being sprayed, given the disorienting effects of the pepper spray. By the time Jackson was placed in the Pink Room, he was not a danger to himself or the officers. He did not possess any weapons or contraband— the officers knew this because Jackson had just submitted to two body searches—and he was rendered helpless by the pepper spray. Given this, a reasonable jury could easily have found that extended isolation confinement without the opportunity to wash off the pepper spray was unnecessary. But, even assuming that it was necessary to transfer Jackson to the Pink Room, the officers have offered no justification for the prolonged use of the painfully tight restraints. Thus, a reasonable jury could certainly have concluded that the prolonged use of in-cell shackles were unnecessary.
The second Whitley factor, the relationship between the need for the force and the amount of force used, is closely related to the first factor. As stated above, while Jackson’s intransigence might have justified the use of some force, the evidence supports a finding that the amount of force used in this case was grossly disproportionate to the need. By the time the Response Team arrived at Jackson’s cell, he was calm and had ceased to cause a disturbance. Nonetheless, the officers sprayed him with twelve bursts of pepper spray. After that, Jackson was nearly helpless and complied with all of the officers’ orders. Nonetheless, the officers painfully *111 restrained him and placed him in the Pink Room for an extended period of time, without clothing or an opportunity to wash off the pepper spray. Given that the Pink Room is designed to allow an inmate creating a disturbance an opportunity to “cool off,” and Jackson was calm for the first seventeen hours of his forty-four hour confinement, there was no justification for keeping Jackson in the Pink Room for such an extended period.
With respect to the third Whitley factor, the jury certainly could have found that the officers did not “reasonably perceive” that Jackson posed any threat to then-safety that would require them to use this amount of force. As stated above, at the time of the incident, the officers knew that Jackson did not possess any contraband, or anything that could be used as a weapon, because they had just subjected him to a cell and body search. Even if the officers needed to place Jackson in restraints while transporting him to the Pink Room for a limited cooling-off period, there was no evidence of any threat justifying the officers’ excessive response. In fact, the prison’s own policy states that in-cell restraints are only to be used when an inmate poses a threat to himself or others, and the officers offered no evidence that Jackson posed any such danger here.
As to the fourth Whitley factor—the officers’ effort to temper the severity of their response—it appears that no such effort was made in this case. The officers persisted in using force against Jackson—• including Officer Fenton’s unwarranted blow to Jackson’s head—even after he was incapacitated by the pepper spray and had complied with all orders. Moreover, even though Jackson was calm during his confinement in the Pink Room, the officers kept him there, in restraints, for nearly two days. Both of these facts indicate that the officers failed to temper their response to accord with the situation.
In short, reviewing the evidence, as we must, with the appropriate deference to the jury’s factual findings, each of the four Whitley factors weighs in favor of Jackson.[4] Given the officers’ unjustifiable use of force and excessively punitive measures, it was certainly reasonable for the jury to conclude that they acted both maliciously and sadistically in confining Jackson to the Pink Room in these conditions for a period of nearly two days.
VI.
For the reasons set forth above, I believe that there was a “legally sufficient evidentiary basis for a reasonable jury” to decide that the officers’ actions constituted excessive force in violation of the Eighth Amendment. 1 Fed.R.Civ.P. 50(a)(1); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Accordingly, I respectfully dissent from the majority’s holding to the contrary.[5]

. Jackson introduced the following uncontroverted evidence as to the pepper spray the officers used against him. The spray consisted of ninety percent Freon-based chemical, which acted as a propellant, and ten percent Oleo Resin Capsicum, which is derived from the hot oil and waxes of the cayenne pepper. This chemical takes effect upon contact with skin and mucous membranes and causes a painful, burning sensation, inflammation of the mucous membranes in the eyes, nose and throat, skin inflammation, coughing or gagging if inhaled and an involuntary closing of the eyes. The physical effects of the spray are accompanied by psychological effects, including fear, disorientation, anxiety and panic.

. Jackson also alleged that he was placed in an isolation cell without due process of law. Judge Grimm granted the officers' motion for judgment as a matter of law on Jackson’s Fourteenth Amendment due process claim on qualified immunity grounds, concluding that there was no clearly established constitutional right to a pre-deprivation hearing prior to placement of an inmate in the isolation cell. Jackson does not appeal that ruling.

. The majority concludes that the three-point restraints could not have totally prevented Jackson from using his hands because he was wearing three-point restraints when he used his hands to flush his face and groin with water in the infirmary. See ante at 103. However, between Jackson’s visit to the infirmary and his confinement in the Pink Room, Jackson’s shackles were removed to permit him to change his underwear and he was then re-shackled before being placed in the Pink Room. Thus, the fact that he could move his hands while in the infirmary does not mean that he could move them equally well when confined in the Pink Room because the shackles could have been placed on Jackson more tightly the second time. In any event, we are required to credit Jackson’s testimony that, during his time in isolation confinement, he could not move his hands to remove his underwear or to eat.

. Although it is true, as the majority notes, that courts should afford deference to prison officials, see ante at 100, particularly where the initial application of force is a “good faith effort to maintain discipline,” it is equally true that courts must not allow such deference to "insulate from review actions taken in bad faith for no legitimate purpose.” Whitley, 475 U.S. at 322, 106 S.Ct. 1078. Where, as here, prison officials’ actions lack a legitimate purpose, it is reasonable to infer, that those actions constitute wanton punishment.

. The officers assert that even if they used excessive force in confining Jackson to the Pink Room, they are entitled to qualified im *112 munity because, at that time, it was not clearly established that the level of force used in this case was excessive. “[G]ovemment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). "Clearly established for the purposes of qualified immunity means that the ‘contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.’ ” Id. at 614-15, 119 S.Ct. 1692. At the time of the events at issue in this case, it was "clearly established” that the wanton infliction of pain on an inmate without penological justification constitutes cruel and unusual punishment. See Whitley, 475 U.S. at 319, 106 S.Ct. 1078 ("[T]he unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment....”). Abundant and virtually uncontroverted evidence demonstrated that, after failing to decontaminate Jackson properly from the effects of the pepper spray, the officers confined him to the Pink Room for a period of'two days—shackled the entire time in painful three-point restraints—and that they took these actions even though Jackson posed no danger to himself or others and was calm for the first seventeen hours of his confinement. In doing so, the officers "unnecessarily] and wantonfly] inflict[ed] ... pain,” an act which the Supreme Court held more than a dozen years ago is "forbidden by the Eighth Amendment.” Id. Qualified immunity offers no escape for those who engage in such conduct.